## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **DAVID T. DUVAL,** | ) | |
| Plaintiff | ) | |
| | ) | Civil Action No. 2:22cv00018 |
| v. | ) | |
| | ) | **REPORT AND** |
| **KILOLO KIJAKAZI,** | ) | **RECOMMENDATION** |
| **Acting Commissioner of Social** | ) | |
| **Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |
| | ) | |

*I. Background and Standard of Review*

Plaintiff, David T. Duval, ("Duval"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). Neither party has requested oral argument. This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may

be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Duval protectively filed his application for DIB on September 25, 2020, alleging disability as of August 26, 2020, based on depression; anxiety; a back injury; and post-traumatic stress disorder, ("PTSD"). (Record, ("R."), at 15, 162-63, 198, 231.) The claim was denied initially and upon reconsideration. (R. at 97-105.) Duval then requested a hearing before an administrative law judge, ("ALJ"). (R. at 108.) The ALJ held a hearing on February 4, 2022, at which Duval was represented by counsel. (R. at 36-64.)

By decision dated February 17, 2022, the ALJ denied Duval's claim. (R. at 15-31.) The ALJ found that Duval meets the nondisability insured status requirements of the Act for DIB purposes through December 31, 2025. (R. at 17.) The ALJ found that Duval had not engaged in substantial gainful activity since August 26, 2020,[1] the alleged onset date. (R. at 17.) The ALJ found that the medical evidence established that Duval had severe impairments, namely, obesity; lumbago/mild lumbar spine degeneration; anxiety; depression; PTSD; and a substance use disorder, but he found that Duval did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17-18.) The ALJ

---

[1] Duval must show that he became disabled between August 26, 2020, his alleged disability onset date, and February 17, 2022, the date of the ALJ's decision, to be eligible for benefits.

found that Duval had the residual functional capacity to perform medium[2] work, except he was limited to instructions and tasks that could be learned in 30 days or less; he could perform occasional decision-making in a work setting with no more than occasional changes; and he could have no more than occasional interaction with the public and co-workers.[3] (R. at 21.) The ALJ found that Duval was unable to perform his past relevant work. (R. at 29.) Based on Duval's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of other jobs existed in the national economy that Duval could perform, including jobs as a hand packager, a stacker and a rack loader. (R. at 29-30, 61-62.) Thus, the ALJ concluded that Duval was not under a disability as defined by the Act and was not eligible for DIB benefits. (R. at 30.) *See* 20 C.F.R. § 404.1520(g) (2022).

After the ALJ issued his decision, Duval pursued his administrative appeals, (R. at 246-47), but the Appeals Council denied his request for review. (R. at 1-5.) Duval then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2022). This case is before this court on Duval's motion for summary judgment filed February 8, 2023, and the Commissioner's motion for summary judgment filed March 15, 2023.

---

[2] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2022).

[3] The ALJ also placed several limitations on Duval's work-related physical abilities; however, since Duval's argument centers around his mental limitations, the court will discuss only the limitations related to his mental residual functional capacity. (R. at 21.)

## II. Facts[4]

Duval was born in 1966, (R. at 29, 162), which, at the time of the ALJ's decision, classified him as a "person of advanced age" under 20 C.F.R. § 404.1563(e), and, at the time of his alleged disability onset date, classified him as a "person closely approaching advanced age" under 20 C.F.R. § 404.1563(d). Duval has some college education and past relevant work as a patrol officer, a school resource officer and a police investigator. (R. at 41-42, 60, 199.) Duval testified that, on August 26, 2020, he had a mental breakdown involving substance use, suicidal ideation and homicidal ideation. (R. at 47.) He stated his mental impairments significantly worsened in 2020 after his daughter and granddaughter were murdered, but he stated he had experienced some mental health symptoms before the alleged onset date. (R. at 50.) Duval stated he experienced anxiety when his wife left the house for fear that something would happen to her, and he worried that someone in his family was going to die. (R. at 51.) He stated he did not leave his house often because of serious anxiety issues. (R. at 48.) Duval stated he played his guitar as a hobby, including with other musicians at his church. (R. at 49, 518, 1182.) He stated his medication helped his depression and anxiety, but he still had symptoms and limitations. (R. at 52-53.) Duval stated he had not consumed alcohol since September 2021. (R. at 53.) Duval stated that, prior to his hearing, he and his wife were raising their grandchildren, but the children's parents regained custody. (R. at 46-47.) He stated that when he had custody of his grandchildren, he supervised them and helped them with their homework. (R. at 206.)

---

[4]  Duval's only dispute is with respect to the ALJ's assessment of his mental limitations. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-6.) Therefore, the court will address only the facts relevant to Duval's mental residual functional capacity.

In rendering his decision, the ALJ reviewed medical records from Leslie Montgomery, Ph.D., a state agency psychologist; Jo McClain, Psy.D., a state agency psychologist; Norton Community Hospital; James H. Quillen Veterans Affairs Medical Center, ("VA"); Virginia Department of Rehabilitative Services; and Melinda M. Fields, Ph.D., a licensed psychologist.

Records from the VA note that Duval had been involved in mental health treatment for several years, and he was prescribed medication to address his anger issues in 2007, which Duval reported was helpful. (R. at 501.) Duval was seen for one therapy session in 2012. (R. at 501.) Duval was diagnosed with anxiety and depression in 2013, and with those conditions, he worked for several different police departments as a patrol officer, a school resource officer and an investigator. (R. at 41-43, 331-32.) He was referred for treatment for anger issues in 2016 and 2018. (R. at 501.) In 2018, Duval reported he was experiencing anxiety and depression, which he attributed to his work environment. (R. at 501.) He continued psychiatric treatment at the VA through 2020 for PTSD, chronic; major depressive disorder; adjustment disorder with mixed anxiety and depressed mood; anxiety disorder, unspecified; and alcohol abuse, uncomplicated. (R. at 426-39, 444-45, 447-48, 467-69, 479-620.)

On August 26, 2020, Duval presented to the emergency department at Norton Community Hospital for depressive symptoms and severe grief.[5] (R. at

---

[5] Duval reported he had suicidal and homicidal ideations towards the people who killed his daughter and granddaughter. (R. at 529.) The sheriff was called, and he was taken to the emergency room where he was kept for 24 hours while he gained sobriety. (R. at 529.) He was evaluated by mental health and released. (R. at 529.) He reported additional stressors, including experiencing six family deaths in six months, financial problems and family issues. (R. at 529.) Duval was suspended from work with pay through June 2021, when he retired with a state pension. (R. at 40, 1942.)

409-12.) He admitted to consuming alcohol. (R. at 409.) Duval was diagnosed with depression and discharged in stable condition. (R. at 410.)

On September 2, 2020, Duval was seen at the VA for a psychiatric visit. (R. at 529.) Duval was neatly dressed and groomed; he exhibited no tics, tremors or abnormal movements; he was cooperative and pleasant; his speech was normal; his affect was labile; his mood was anxious; this thought process was coherent and goal-directed; he denied suicidal and homicidal ideations; he was alert and fully oriented; and his judgment and insight were adequate for immediate safety. (R. at 530-31.) Dr. Elizabeth A. Martin, M.D., a psychiatrist, diagnosed major depressive disorder and alcohol use disorder. (R. at 531, 536.) On September 9, 2020, Duval stated the stress related to his family loss caused him to self-medicate with alcohol and led to the loss of his job.[6] (R. at 527.) He was willing to try substance abuse counseling. (R. at 528.) Duval was fully oriented; he had intact memory; he was pleasant and cooperative; his speech was normal; his thought process was linear and logical; he denied audio and visual hallucinations; he denied suicidal and homicidal ideations, but stated he did not completely trust that he would not have suicidal thoughts or feelings again; and his judgment and insight were fair. (R. at 528.)

Duval continued to receive mental health counseling and medication management with Tara Marie Livengood, Psy.D., a clinical psychologist with the VA, on a regular basis for the remainder of 2020. During this time, Duval reported that he continued to consume alcohol. (R. at 446, 449, 468, 479, 482, 487, 491,

---

[6] Duval reported that his daughter and her unborn child were murdered, and a few weeks following their loss, his niece died of a heart attack. (R. at 527.) He expressed both loss and anger and stated that the stress of these events escalated his alcohol consumption and led to the loss of his job. (R. at 527.)

493, 501, 505, 507, 508, 518, 520, 1034.) During this time, he had appropriate grooming; he had appropriate and direct eye contact; he was fully oriented; his attention and concentration was intact, but, at times, distractible, but he responded to redirection; his speech was normal but, at times, fast paced with normal rhythm and tone; his thought process was linear and goal-directed; his thought content was not suggestive of delusional content or preoccupation; he was cooperative and fidgety; his affect ranged from euthymic to constricted, labile and depressed; he had no suicidal or homicidal ideation; he was aware of his experiences; and he recognized his need for psychiatric treatment. (R. at 438-39, 444-45, 447, 467, 469, 479, 483, 491, 494, 500, 506-07, 509, 515-18, 520-22, 1031.)

In December 2020, Livengood noted that Duval's results from the Millon Clinical Multiaxial Inventory-IV, ("MCMI-IV"), revealed the presence of characterological traits, but did not indicate the presence of a personality disorder. (R. at 445.) The Personality Assessment Inventory, ("PAI"), revealed symptoms consistent with a severe major depressive episode and generalized anxiety disorder. (R. at 447.) The Clinician-Administered PTSD Scale for DSM-5, ("CAPS-5"), was administered, and revealed Duval experienced symptoms consistent with PTSD. (R. at 439.)

On December 29, 2020, Livengood wrote a letter discussing Duval's psychiatric signs, symptoms and treatment/prognosis. (R. at 618-20.) Livengood noted that results of the CAPS-5 revealed that during Duval's employment in law enforcement, he experienced repeated and extreme exposure to aversive details of traumatic events, and he experienced distress during intrusive and unwanted memories, which occurred daily. (R. at 618.) Livengood reported that the overall severity of Duval's PTSD symptoms were extreme, as they caused him severe to

-7-

incapacitating distress and impacted all of his areas of functioning. (R. at 619.) She noted Duval's responses during administration of the CAPS-5, his self-report and behavioral observations were consistent with his presentation over the course of psychological testing sessions and collateral sources. (R. at 619.) Livengood stated that, "[i]t is not likely [Duval] will be able to return to an employment setting." (R. at 620.) She based her opinion on the presence of comorbid conditions, including PTSD, major depressive disorder and generalized anxiety disorder. (R. at 620.)

Between January and March 2021, Duval continued with telephonic psychotherapy and participated in cognitive processing therapy. (R. at 637-65.)

On March 9, 2021, Duval presented to the emergency department at Norton Community Hospital, reporting a fast heart rate after consuming "a lot of alcohol" and smoking a vape pen with marijuana. (R. at 1099.) He denied hallucinations and suicidal and homicidal ideations. (R. at 1099.) Duval admitted to consuming more alcoholic beverages than "a human being should," but was not interested in detoxification. (R. at 1099.) Duval was alert and fully oriented, and his mood, behavior, thought content and judgment were normal. (R. at 1101.) He was diagnosed with alcoholic intoxication with complication and shortness of breath. (R. at 1101.)

On April 20, 2021, Livengood reported that Duval scored four on the Patient Health Questionnaire-9, ("PHQ-9"), which suggested minimal depression. (R. at 889.) Duval reported his mood was "lower" over the past three to four weeks due to chronic back pain that prevented him from engaging in daily activities. (R. at 889.) Livengood noted that Duval demonstrated progress in psychotherapy, evidenced by decreased symptoms, generalized use of adaptive coping skills and

significant decrease in alcohol consumption. (R. at 890.) Duval requested that his medication dosage be lowered. (R. at 891.) On May 12, 2021, Duval reported that he was drinking less, and his mood was better. (R. at 881-82.) He reported he bought a guitar to play at church. (R. at 882.) Duval was cooperative and pleasant; his speech was normal; his thought process was coherent and goal-directed; he denied suicidal and homicidal ideations; he exhibited no hallucinations or delusions; he was alert and oriented; and his judgment and insight were adequate for immediate safety. (R. at 882.)

On June 12, 2021, Amanda Whitley, AGPCNP-C, an adult-gerontology primary care certified nurse practitioner with the Virginia Department of Rehabilitative Services, evaluated Duval. (R. at 860-65.) Duval alleged disability due to depression, anxiety and a back injury. (R. at 860.) He reported his pregnant daughter was killed by his son-in-law, which caused him to experience major depression with anxiety and anger episodes. (R. at 860.) Duval reported his medication helped; however, he stated he did not get out much and stayed home to manage his symptoms. (R. at 860.) Whitley reported that Duval was cooperative, alert and fully oriented; his mood and affect were appropriate; and his thought processes were linear and logical. (R. at 861.) She diagnosed depression with anxiety and opined his prognosis was fair; and PTSD and opined his prognosis was good. (R. at 864.)

On June 22, 2021, Leslie Montgomery, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding Duval's depressive, bipolar and related disorders; anxiety and obsessive-compulsive disorders; and trauma- and stressor-related disorders were severe. (R. at 68-69.) She found his substance addiction disorder (alcohol) was nonsevere. (R. at 68.)

Montgomery opined Duval had moderate limitations on his ability to understand, remember or apply information; to interact with others; and to concentrate, persist or maintain pace; and mild limitations on his ability to adapt or manage himself. (R. at 69.) Montgomery noted Duval's diagnoses of PTSD, depression, anxiety and alcohol use. (R. at 68.) She noted that during multiple examinations in 2020, Duval had a euthymic mood, linear and logical thoughts, fair judgment and insight and intact attention and concentration. (R. at 68.) In November 2020, Duval was distractable and, during an examination in June 2021, he was alert and oriented; he had normal speech; his mood and affect were appropriate; and his thought processes were linear and logical. (R. at 68.) She opined Duvall would be limited to simple, unskilled work. (R. at 68.)

That same day, Montgomery completed a mental assessment, finding Duval had moderate[7] limitations in his ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (R. at 71-72.) Montgomery stated Duval's work-related mental abilities were, otherwise, not significantly limited. (R. at 71-72.)

---

[7] The regulations define "moderate limitations" as an individual's ability to function independently, appropriately, effectively and on a sustained basis as fair. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F)(2)(c) (2022).

On August 5, 2021, Jo McClain, Psy.D., a state agency psychologist, completed a PRTF, finding Duval's depressive, bipolar and related disorders and trauma- and stressor-related disorders were severe. (R. at 78.) She found his substance addiction disorder (alcohol) was nonsevere. (R. at 78.) McClain opined Duval had mild limitations on his ability to understand, remember or apply information and moderate limitations on his ability to interact with others; to concentrate, persist or maintain pace; and to adapt or manage himself. (R. at 78.) McClain noted that Duval had experienced very serious psychological trauma related to the murder of his daughter, yet, new evidence showed improvement of his symptoms, including improved mood and increased functioning. (R. at 79.)

That same day, McClain completed a mental assessment, finding Duval had moderate limitations in his ability to carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; to respond appropriately to changes in the work setting; and to set realistic goals or make plans independently of others. (R. at 81-82.) McClain stated Duval's work-related mental abilities were, otherwise, not significantly limited. (R. at 81-82.) She based her findings on Duval's depression, anxiety and PTSD. (R. at 81-82.) McClain opined that Duval could complete simple, repetitive tasks; interact with others occasionally and work independently; and adjust to minor changes in the workplace. (R. at 81-82.)

On August 20, 2021, Duval was admitted to the VA for alcohol intoxication with suicidal and homicidal ideation. (R. at 1163.) His urine drug screen was positive for cannabis. (R. at 1163.) Duval reported increasing depression and stated he was "tired of living in this world." (R. at 1164.) He was discharged on August 22, 2021, with diagnoses of alcohol use disorder; major depressive disorder; PTSD; and insomnia due to mental disorder. (R. at 1163.)

On September 12, 2021, Duval was admitted to the VA after being brought to the emergency room by police for suicidal ideation with a plan to hang or shoot himself in the context of alcohol use. (R. at 1155.) His urine drug screen was positive for benzodiazepines. (R. at 1155.) Duval reported worsening depressive symptoms since his daughter and her unborn child were murdered in January 2020. (R. at 1156.) He endorsed homicidal thoughts towards the perpetrators. (R. at 1156.) Duval was discharged on September 17 with diagnoses of mood disorder, unspecified; alcohol dependence with withdrawal, unspecified; PTSD, chronic; and sedative/hypnotic/anxiolytic intoxication with mild use disorder. (R. at 1155.) On September 20, 2021, Duval reported he was doing well. (R. at 1263.) He stated he had not been consuming alcohol, and he believed his medication helped with his cravings. (R. at 1263.) On September 29, 2021, Duval saw Dr. Elizabeth A. Martin, M.D., a psychiatrist with the VA, reporting his sleep was mostly regulated. (R. at 1230.) He stated he was not consuming alcohol. (R. at 1230.) Duval stated he had been attending church services and had not experienced any outbursts of anger. (R. at 1230.) He stated he felt like a "different person." (R. at 1230.) Duval was cooperative and pleasant; his speech was rapid; his affect was labile; he exhibited no tics, tremors, abnormal movements, psychomotor agitation or slowing; his thought process was coherent; he denied suicidal and homicidal

ideations; he denied hallucinations and delusions; he was alert and fully oriented; and his judgment and insight were adequate for immediate safety. (R. at 1231-32.)

On October 13, 2021, Duval saw Dr. Martin, reporting he was sleeping better. (R. at 1195.) He denied any depressed mood and suicidal ideation. (R. at 1196.) Duval stated he was working on recording music. (R. at 1196.) He stated he felt better on his current medications, and his mood was stable with no mania or depressed mood. (R. at 1196-97.) Duval's examination findings remained unchanged, except it was noted that his speech was less rapid, and his mood was good. (R. at 1197.)

On November 17, 2021, though Duval had some sadness about needing to testify at his daughter's homicide trial, he reported he was taking his medication, and his mood was stable with no mania or depressed mood. (R. at 1181-82.) Duval reported some stressors, including a recent murder of a police officer he knew. (R. at 1182.) He planned on going to the funeral, but said he would avoid the crowds. (R. at 1182.) Duval reported that, while he preferred to stay at home, he went to church services twice a week, and he also practiced songs with other musicians. (R. at 1182.) Duval's examination findings remained unchanged. (R. at 1183.) Dr. Martin diagnosed PTSD; major depressive disorder, recurrent, in remission; and alcohol use disorder, severe, abstinent since September 12, 2021. (R. at 1184.)

On December 13, 2021, Cheryl D. Hunley, L.C.S.W., a licensed clinical social worker at the VA, noted that Duval completed his scheduled appointments and appeared to be doing well. (R. at 1175.) He consistently denied suicidal ideations and reported sobriety and good family and social support. (R. at 1175.) On December 23, 2021, the suicide prevention coordinator at the VA determined

that Duval no longer met the criteria for placement on the high-risk list for suicide. (R. at 1171.)

On December 15, 2021, Melinda M. Fields, Ph.D., a licensed psychologist, evaluated Duval at the request of Disability Determination Services. (R. at 1940-45.) Duval reported use of cannabis two times monthly since retiring and related, "I don't like it, it makes me paranoid." (R. at 1941.) He reported an increase in use of alcohol in 2015 and 2020, following the murder of his daughter. (R. at 1941.) Duval reported inpatient treatment in August and September 2021, and he denied use of alcohol since his last treatment. (R. at 1941.) Duval reported a history of trauma and described nightmares and intrusive recollections. (R. at 1941.) He stated that, in 2007, he experienced an increase in anger, with outbursts, which led to being suspended from work. (R. at 1941-42.) Duval's hygiene and grooming appeared good; he was pleasant and cooperative; he had adequate eye contact; he was fully oriented; his stream of thought was organized and logical; he exhibited no evidence of a thought content impairment or perceptual disturbances; his judgment was adequate, as evidenced by responses to presented scenarios; his immediate memory was normal; his recent recall was impaired, as he could recall only one of four words after a delay; his concentration was impaired, as evidenced by serial seven performance; and his pace, posture and gait were normal. (R. at 1943.) The Beck Depression Inventory, ("BDI"), and the Beck Anxiety Inventory, ("BAI"), were indicative of significant depressive and anxiety-related symptomatology. (R. at 1944.) Duval's responses to the Adult Attention-Deficit/Hyperactivity Disorder Self-Report Scale Symptom Checklist were consistent with attention deficit hyperactivity disorder, ("ADHD"), symptoms. (R. at 1944.) Fields diagnosed major depressive disorder; PTSD; generalized anxiety disorder; ADHD, by report; and alcohol use disorder, by report. (R. at 1944.)

That same day, Fields completed a mental assessment, finding Duval had no limitations in his ability to maintain appearance and a satisfactory ability to follow work rules; to use judgment in public; to understand, remember and carry out simple job instructions; and to demonstrate reliability. (R. at 1946-48.) She opined Duval had marked limitations, resulting in an unsatisfactory work performance, in his ability to make all other occupational, performance and personal/social adjustments. (R. at 1946-47.) She found Duval would be absent from work more than two days a month. (R. at 1948.) Fields based these findings on Duval's impaired concentration and memory; PSTD symptoms; impaired social functioning; and depression. (R. at 1947-48.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2022). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4ᵗʰ Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2022).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that

the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Duval filed his application in September 2020; thus, 20 C.F.R. § 404.1520c governs how the ALJ considered the medical opinions here.[8] When making a residual functional capacity assessment, the ALJ must assess every medical opinion received in evidence. The regulations provide that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight" to any medical opinions or prior administrative medical findings, including those from the claimant's medical sources. 20 C.F.R. § 404.1520c(a) (2022). Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and

---

[8] 20 C.F.R. § 404.1520c applies to claims filed on or after March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)).

all prior administrative medical findings in a claimant's case. *See* 20 C.F.R. §
404.1520c(b), (c)(1)-(5) (2022) (emphasis added). Moreover, when a medical
source provides more than one opinion or finding, the ALJ will evaluate the
persuasiveness of such opinions or findings "together in a single analysis" and
need not articulate how he or she considered those opinions or findings
"individually." 20 C.F.R. § 404.1520c(b)(1) (2022).

The most important factors in evaluating the persuasiveness of these medical
opinions and prior administrative medical findings are supportability and
consistency, and the ALJ will explain how he considered these two factors in his
decision. *See* 20 C.F.R. § 404.1520c(b)(2). "Supportability" means "[t]he extent to
which a medical source's opinion is supported by relevant objective medical
evidence and the source's supporting explanation." Revisions to Rules, 82 Fed.
Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(1). "Consistency" denotes "the
extent to which the opinion is consistent with the evidence from other medical
sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at
5853; *see also* 20 C.F.R. § 404.1520c(c)(2). The ALJ is not required to explain the
consideration of the other three factors, including relationship with the claimant,
specialization and other factors such as an understanding of the disability
program's policies and evidentiary requirements.[9]  *See*  20  C.F.R.  §
404.1520c(b)(2).

---

[9] An exception to this is that when the ALJ finds that two or more "medical opinions or
prior administrative medical findings about the same issue are both equally well-supported [] and
consistent with the record [] but are not exactly the same," the ALJ will explain how he
considered the other most persuasive factors including: the medical source's relationship with the
claimant, specialization and other factors that tend to support or contradict a medical opinion. 20
C.F.R. § 404.1520c(b)(3) (2022).

A claimant's residual functional capacity refers to the most the claimant can still do despite his limitations. *See* 20 C.F.R. § 404.1545(a) (2022). The ALJ found that Duval had the residual functional capacity to perform medium work, except he was limited to instructions and tasks that could be learned in 30 days or less; he could perform occasional decision-making in a work setting with no more than occasional changes; and he could have no more than occasional interaction with the public and co-workers. (R. at 21.)

Duval argues the ALJ erred by improperly determining his residual functional capacity by rejecting the opinions of Livengood and Fields. (Plaintiff's Brief at 4-6.) The Commissioner, however, argues that Livengood's December 2020 opinion does not constitute a medical opinion, as defined by 20 C.F.R. § 404.1513. (Defendant's Brief In Support Of Her Motion For Summary Judgment, ("Defendant's Brief"), at 7-9.)

Because this claim was filed after March 27, 2017, the criteria set forth in 20 C.F.R. § 404.1513(a)(2) governs whether a statement qualifies as a medical opinion. The term "medical opinion," as used in § 404.1520c, is specifically defined in § 404.1513. Section § 404.1513(a)(2) defines "medical opinion" as:

> (a)(2) …A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities: …
>
> (i)  Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);
>
> (ii)  Your ability to perform mental demands of work activities,

> such as understanding; remembering; maintaining
> concentration, persistence, or pace; carrying out instructions; or
> responding appropriately to supervision, co-workers, or work
> pressures in a work setting;
>
> (iii)  Your ability to perform other demands of work, such as seeing,
> hearing, or using other senses; and
>
> (iv)  Your ability to adapt to environmental conditions, such as
> temperature extremes or fumes.

20 C.F.R. § 404.1513(a)(2) (2022). Under the applicable rules for evaluating
medical opinions, the ALJ is not to defer to or give any specific weight to medical
opinions. *See* 20 C.F.R. § 404.1520c(a). Contrary to Duval's argument, the record
contains no statement from Livengood that meets the regulatory definition of a
medical opinion in 20 C.F.R. § 404.1513(a)(2), as she never addressed any
particular abilities or restrictions that were imposed by Duval's impairments.
Although Duval had an anxious mood, and his affect was euthymic, constricted,
labile or depressed at times, he was cooperative and pleasant; his speech was
normal; his thought process was coherent and goal-directed; he was alert and fully
oriented; and his judgment and insight were adequate. In April 2021, Livengood
reported that Duval scored four on the PHQ-9, which suggested minimal
depression. She noted Duval demonstrated progress in psychotherapy, evidenced
by decreased symptoms, generalized use of adaptive coping skills and significant
decease in alcohol consumption. Duval reported that he was drinking less, and his
mood was better. He reported his medications improved his symptoms. "If a
symptom can be reasonably controlled by medication or treatment, it is not
disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

The record shows that Duval was admitted for alcohol intoxication with
suicidal and homicidal ideation in August and September 2021. However, on

September 20 and 29, 2021, Duval reported he was not consuming alcohol, and he was doing well. He stated he was attending church services and felt like a "different person." In October and November 2021, Duval reported he felt better on his current medications, and his mood was stable with no mania or depressed mood. He stated he was working on recording music. In December 2021, Duval no longer met the criteria for placement on the high-risk list for suicide.

Based on my review of the record, I agree with the Commissioner that Livengood's December 2020 correspondence does not meet the regulatory definition of a "medical opinion" under 20 C.F.R. § 404.1513(a)(2). As of the date of Livengood's December 2020 correspondence, Duval participated in 34 appointments for psychiatry and psychology over the prior two years. While Livengood's notes provide Duval's medical history, clinical findings, diagnoses and prescribed treatment, she did not mention whether or how this would impact or limit his ability to work. That is, no mention is made of Duval's ability to perform any physical demands of work, mental demands of work, other demands of work or ability to adapt to environmental conditions. *See* 20 C.F.R. § 404.1513(a)(2).

Duval also argues the ALJ erred by rejecting Fields's opinion. In making his residual functional capacity finding, the ALJ found Fields's December 2021 mental assessment unpersuasive, as it was unsupported by her own examination findings and inconsistent with the overall medical evidence of record. (R. at 28-29.) The ALJ noted that, on exam, Fields found that Duval had normal immediate memory, which suggests the ability to perform simple tasks. (R. at 28.) The ALJ also explained that Fields found Duval to be pleasant, cooperative and to have normal eye contact, speech, thought content and pace. (R. at 25.) The ALJ considered that Duval decompensated twice and required hospitalization for

detoxification, but explained that these were only for "two brief periods," and he found this did not equate to consistently needing to miss two days of work per month, especially since, otherwise, his treatment was "regular outpatient medication management and counseling," and "treating practitioners consistently noted normal mental status examination, except for occasional anxious mood [and] affect." (R. at 26, 29.)

The ALJ stated he found the opinions of the state agency psychologists persuasive because they were consistent with the totality of the medical evidence, which showed since Duval's mental breakdown of the alleged onset date, he improved and was usually stable at appointments. (R. at 27-28.) He noted the state agency psychologists supported their opinions with their summary of and citations to the objective medical evidence, including mental status examination findings and the types of treatment Duval received after the alleged onset date. (R. at 28.) While the ALJ noted that Duval needed a few days of inpatient treatment in 2021 for detoxification, he found that Duval went to "routine help appointments," used mostly the same routine medications and had normal mental status, other than occasional mood/affect findings. (R. at 28.) In addition, the ALJ specifically discussed that, in May 2021, when Duval reported that he was drinking less, his mood was better. (R. at 25.) In October 2021, after he was discharged from detoxification, Duval reported that his mood was much better and, in November 2021, he reported some stress-inducing situations, but his mental status largely was normal. (R. at 25.)

Based on the above, I find that substantial evidence exists to support the ALJ's finding regarding Duval's mental residual functional capacity.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists to support the ALJ's consideration of the medical evidence;

2. Substantial evidence exists in the record to support the ALJ's mental residual functional capacity; and

3. Substantial evidence exists in the record to support the Commissioner's finding that Duval was not disabled under the Act.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Duval's motion for summary judgment; grant the Commissioner's motion for summary judgment; and affirm the Commissioners decision denying benefits.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of

the court may accept, reject, or modify, in whole or in part, the
findings or recommendations made by the magistrate judge. The judge
may also receive further evidence or recommit the matter to the
magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and
recommendations within 14 days could waive appellate review. At the conclusion
of the 14-day period, the Clerk is directed to transmit the record in this matter to
the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and
Recommendation to all counsel of record at this time.

DATED:      January 5, 2024.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE